**IN RE APPLIANCE NOW, INC., Debtor.**

**Case No. 6:11–bk–05867–KSJ**

United States Bankruptcy Court, M.D. Florida, Orlando Division.

Signed March 20, 2017

844

Victoria Kothari, Latham Shuker Eden & Beaudine LLP, Orlando, FL, Justin M. Luna, Latham, Shuker, Eden & Beaudine, LLP, Orlando, FL, R. Scott Shuker, Latham Shuker Eden & Beaudine LLP, Orlando, FL, for Debtor.

Jill E. Kelso, Office of the United States Trustee, Orlando, FL, for U.S. Trustee.

### ORDER CLARIFYING CONFIRMATION ORDER

Karen S. Jennemann, United States Bankruptcy Judge

Four unsecured creditors rely on a mistakenly included phrase in the order

confirming the Debtor's Plan of Reorganization[1] to argue their prepetition employment related claims remain collectible. The improperly inserted phrase arguably allows claims for "gross negligence or willful misconduct" to survive; however, such a reading is inconsistent with the Plan and other provisions of the Confirmation Order, and is stricken from the Confirmation Order.[2] The Court will grant the Creditors' Motion for Clarification[3] to establish that the Creditors[4] are forever enjoined from collecting upon their prepetition claims.

Debtor,[5] a home appliance retailer and its affiliates, filed their Chapter 11 cases seeking financial reorganization in 2011.[6] They confirmed their Plan later that year.[7]

Debtor filed this Chapter 11 case, in part, to finally resolve the claims of these Creditors.

Creditors each have an unsecured prepetition claim against the Debtor. The claims were the subject of litigation pending in federal or state courts filed before these bankruptcy cases were initiated and asserted sexual harassment or employment retaliation claims against their employer—the Debtor. Ms. Stebbins filed a claim in the main case and the GROJ case,[8] and appeared at the confirmation hearing.[9] Ms. Blizzard[10] and Ms. Sapp[11] filed claims in the GROJ case. Ms. Kirby filed no formal claim in the cases, but she obtained a judgment in a federal court lawsuit against the Debtor.[12] Debtor listed

1. Doc. Nos. 81, 82, and 118, referred to as the "Plan."

2. Doc. No. 158, referred to as the "Confirmation Order."

3. Doc. No. 232. Debtor opposed the Motion. Doc. No. 238. Creditors then filed a reply. Doc. No. 241.

4. The four creditors are Ms. Neina Blizzard, Ms. Susan Kirby, Ms. Cindy Stebbins, and Ms. Pamela Sapp collectively referenced as "Creditors." The Court notes the Motion for Clarification names three specific creditors, but the reply to the Debtor's response references four creditors.

5. Appliance Now, Inc. is the name of the lead debtor and is one of eleven cases jointly administered by the Court. Doc. Nos. 28 and 76. The Court will refer to debtors collectively as the "Debtor," the "Reorganized Debtor," or the "Post-Confirmation Debtor."

6. The Petition under Chapter 11 was filed on April 21, 2011. Doc. No. 1.

7. The combined disclosure statement and confirmation hearing was held on September 19, 2011. Doc. No. 141. The Confirmation Order was entered on October 7, 2011. Doc. No. 158.

8. Claim No. 11 in the Main Case; Claim No. 12–1 in Case No. 6:10–bk–09695–KSJ. Ms. Stebbin's claim was based on a sexual harassment federal lawsuit. See Box 2, Claim No. 11 (providing basis for claim), Case No. 6:08–cv–1029 in the United States District Court for the Middle District of Florida.

9. Doc. No. 141.

10. Claim No. 10–1 in Case No. 6:10–bk–09695–KSJ. Ms. Blizzard's claim was based on a sexual harassment lawsuit. See Box 2, Claim No. 10–1 (providing basis for claim), Case No. 05–2007–CA–11525 in the Circuit Court of the Eighteenth Judicial Circuit in and for Brevard County, Florida (trial court docket), and Case No. 5D15–1356 in the Fifth District Court of Appeal (appellate court docket).

11. Claim No. 4 in Case. No. 6:10–bk–09695–KSJ. Ms. Sapp's claim was based on a sexual harassment lawsuit. See Box 2, Claim No. 4 (providing basis for claim) and Case No. 05–2008–CA–41967 in the Circuit Court of the Eighteenth Judicial Circuit in and for Brevard County Florida (trial court docket).

12. Case No. 6:07–cv–01703 in the United States District Court for the Middle District of Florida.

each of the Creditors, including Ms. Kirby, in its schedules as creditors holding unsecured nonpriority claims.[13]

Under the Plan, unsecured creditors, including these four Creditors, are included in Class 4.[14] Each unsecured creditor in Class 4 was given a *pro rata*[15] interest in a "Cash Flow Note"[16] "in full satisfaction" of every allowed unsecured claim.[17] Class 4 creditors would receive quarterly payments under the Cash Flow Note[18] for four years after the "Effective Date."[19] Debtor's obligation to make payments on the Cash Flow Note ended on or about November 6, 2015.[20] Creditors do not dispute they received payments due them under the Cash Flow Note.[21]

The Plan includes a standard "Discharge" section.[22] In exchange for agreeing to make the required payments, upon the Effective Date, the Debtor is *discharged* from all pre-confirmation debt "whether or not (1) A proof of claim based upon such debt is filed or deemed filed under § 501 of the [Bankruptcy] Code; (2) A Claim based upon such debt is allowed under § 502 of the [Bankruptcy] Code; or (3) the holder of a Claim or Interest based upon such debt has accepted the Plan." The Plan further limited creditors from pursuing collection against the succeeding entities, the Post–Confirmation Debtor, by imposing an injunction enjoining any party from any collection activity against them or their property.[23]

---

13. Doc. No. 17 in Case No. 6:10–bk–09695–KSJ. GROJ amended its schedules to list Ms. Kirby's and Ms. Stebbins's claims as undisputed. Doc. No. 87, P. 9.

14. Doc. No. 81, Art. II, P. 14.

15. *"Pro Rata"* is defined to apply to "any Allowed Class 4 claims as of the Effective Date or such later date on which such claim becomes Allowed and their beneficial interest in the Cash Flow Note." Doc. No. 81, Art. I, P. 11.

16. "Cash Flow Note" is defined as "a promissory note, with a face amount equal to all Allowed Class 4 Unsecured Claims, for the benefit of Holders of Allowed Class 4 Claims." Doc. No. 81, Art. I, P. 4.

17. Doc. No. 81, Art. V, ¶ E.

18. Doc. No. 81, Art. V, ¶ E. The quarterly payments would be equal to 50% of "the surplus of cash when comparing actual results versus the Operating Budget." "Operating Budget" is defined as "the Post–Confirmation budget attached as Exhibit 'B' to the Disclosure Statement." Doc. No. 81, Art. I, P. 9. *See also* Doc. No. 81, Art. VIII, P. 29, ¶ A(4) (Means for Implementation of Class 4). The Section titled "Means of Implementation of Class 4" was modified to include the condition that the Debtors will pay under the terms of the Cash Flow Note so long as the Debtors have not defaulted or are in default of the

"Whirlpool Obligations." Doc. No. 118, Art VIII, P. 9, ¶ A(4). The "Whirlpool Obligations" are defined in the written modifications to the Plan—"Debtors will timely make all payments and meet all obligations owing to Whirlpool as the same come due under the Whirlpool Dealer Agreement, this Plan, the Whirlpool Secured Note, and any other agreement between Appliance Now, or the Stores and Whirlpool (collectively, the 'Whirlpool Obligations')." Doc. No. 118, Art. V, P. 6, ¶ 4(a).

19. Doc. No. 81, Art. V, ¶ E. "Effective Date" is defined as "a date thirty (30) days after the Bankruptcy Court has entered the Confirmation Order and provided that no appeal of the Confirmation Order is pending; provided, however, that the Effective Date shall not occur until Debtors file the notice called for under Article VIII(B)(2) of this Plan. In the event that an appeal of the Confirmation Order is pending, the Effective Date may still occur on the 30th day after the entry of the Confirmation Order provided that the notice has been filed." Doc. No. 118, Art. I, P. 3.

20. Doc. No. 186, P. 2.

21. Doc. No. 238, ¶ 19.

22. Doc. No. 81, Art. VIII, P. 37, ¶ I.

23. Doc. No. 81, Art. VIII, P. 31, ¶ B(2).

So, in plain English, the Plan provided that any prepetition unsecured creditor in Class 4 could not seek further payment from the Debtor, the Post-Confirmation Debtor, or their property. This is a standard provision in a Chapter 11 case. Debtors agree to pay their creditors a specified amount and, in exchange and upon confirmation, creditor claims are extinguished.

The confirmation process was straightforward. All needed parties had sufficient time to consider the Plan and its terms.[24] One of the Creditors, Ms. Stebbins, even attended the confirmation hearing. I explained she was bound by the Plan and could not continue to individually collect her claim.[25]

Creditors cast sufficient votes in favor of the Plan overall (and in Class 4 specifically) to allow the Plan to be confirmed.[26] The Confirmation Order provided expressly that the Confirmation Order would control if there were any inconsistencies with the Plan.[27] The Confirmation Order referenced § 1141(b) of the Bankruptcy Code to provide that "all assets and property of the [Debtor] shall be vested in the Post-Confirmation [Debtor] ... free and clear of all liens, claims, and interests of creditors."[28]

■ Now, five years after Confirmation Order was entered[29] and this case initially

24. Doc. No. 158, P. 3.

25. Doc. No. 238, Exh. C, pp. 26–30 (transcript from confirmation hearing). Ms. Stebbins appeared at the confirmation hearing. When the Court asked if Ms. Stebbins would like to be heard, she stated, "I haven't been able to put in a ballot. I had an attorney who has not told me any information in over a year." The Court replied, "Tell me who you worked for—or what's your relationship to the Debtor?" Ms. Stebbins answered, "I worked for Appliance Direct; and I received a judgment against them for $75,000." The Court then questioned, "Okay. When did you get that judgment, approximately?" Ms. Stebbins responded, "It's been a couple years." The Court then stated, "A couple years ago? That's close enough. I just want to get a sense for that." Ms. Stebbins then provided the Court with a little more information when she stated, "And I had been told by his secretary several times in the past years, but they have never sent me any paperwork that payments were going to start. And then I spoke with Mr. Arcadia from Michigan—I was in Michigan a week and a half ago—and he said that Appliance Direct had closed all its stores and nobody was ever going to get paid.... which I knew to be a lie. So I called Mr. Shuck's [sic] office; and he told me I had until October 17th to put in a claim. And then I got a little bit of paperwork from Mr. Arcadia's office and I put in my claim this morning ... but I have no idea what the Plan why I would object or why I would accept." The Court then explained, "Well, it's not going to be overall as much as you want. I think that's pretty much certain. But maybe Mr. Shuker—could you explain what you anticipate? I know you—none of us have crystal balls. You'll get paid—I'm assuming you have a valid claim—assuming you have a valid claim, with other unsecured creditors based upon any—50 percent of the net profits of the Debtor." Debtor's counsel then expanded, "... it would be about a 20 or 30 percent return." The Court then continued, "Yeah. It's not what you want. I mean, I can tell you it's never as much as any creditor would like. And we're not a court that usually can pay 100 percent of claims. I wish we could, but we can't. But that's what you're looking at. Approximately a 20 to 30 percent recovery." Ms. Stebbins then asked, "In the payments or in total?" And the Court replied, "Total. Over time. So it's actually, when you look at today's dollars, it will be affected because it's going to be delayed for some time for the payments to start...." The Court asked if Ms. Stebbins had any more questions to which she replied, "No. I'm still kind of at a loss as to how this works." The Court then explained that other unsecured creditors and other people in Ms. Stebbins's circumstances were supporting the Plan.

26. Doc. No. 158, P. 4, ¶ K.

27. Doc. No. 158, P. 10, ¶ MM.

28. Doc. No. 158, P. 12, ¶ 8.

29. The Confirmation Order was entered on October 7, 2011.

was closed,[30] and one year after all payments due under the Cash Flow Note ended,[31] presumably with the Creditors receiving all payments required under the Plan, Creditors point to one phrase in Paragraph 15 of the Confirmation Order to justify their right to continue collection efforts against the Post–Confirmation Debtor. The bolded language specifically provides:

> In accordance with §§ 524 and 105(a) of the Bankruptcy Code, and except as otherwise provided in the Amended Plan and this Confirmation Order, on and after the Effective Date, all Persons are permanently enjoined and restrained from commencing or continuing in any court any suit, action, or other proceeding, or otherwise asserting any Claim or Interest, seeking to hold liable the Post–Confirmation Debtors or the property of the Post–Confirmation Debtors, for any claim, obligation, right, interests, debt or liability that has been treated pursuant to the Amended Plan and for any and all claims arising under bankruptcy or non-bankruptcy law relating in any way to the Debtors, the Post–Confirmation Debtors or their business, **except for any claims or actions related to gross negligence or willful misconduct.**[32]

Creditors seek clarification that this language allows them to continue collection efforts on their claims, provided they can demonstrate the claims arose from "gross negligence or willful misconduct." [33] This the Court declines to do.

◼ Section 1141 of the Bankruptcy Code [34] describes the effects of plan confirmation.[35] Confirmation of a Chapter 11 plan of reorganization binds debtors and creditors to the plan, vests all property of the estate in the debtor free and clear of all claims and interests, and discharges the debtor of pre-confirmation debt.[36] Courts follow "principles of contract interpretation [when interpreting] a confirmed plan of reorganization." [37] "Traditional contract-interpretation principles make contract interpretation a question of law, decided by reading the words of a contract in the context of the entire contract and construing the contract to effectuate the parties' intent." [38]

◼ The starting point is the language of the contract itself, here, the plan of reorganization.[39] When provisions in a contract conflict, contract interpretation

---

30. The case was closed in March 2012. The case later was reopened at the request of another Class 4 Creditor, General Electric Company, to obtain the financial documents needed to verify payments required under the Cash Flow Note. Doc. Nos. 185 and 186. GE subsequently withdrew its motion and sought to reclose the case. Doc. Nos. 230 and 231.

31. Payments ended on November 6, 2015.

32. Doc. No. 158, P. 14, ¶ 15 (emphasis provided).

33. Doc. Nos. 232, 238, and 241.

34. 11 U.S.C. § 101 et seq.(2012), referenced as the "Bankruptcy Code."

35. 11 U.S.C. § 1141 (2012).

36. *Id.*

37. *Iberiabank v. Bradford Geisen (In re FFS Data, Inc.)*, 776 F.3d 1299, 1304 (11th Cir. 2015) (internal citations omitted).

38. *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1104 (11th Cir. 2014) (citing *Moore v. Pa. Castle Energy Corp.*, 89 F.3d 791, 795–96 (11th Cir. 1996)).

39. *In re FFS Data, Inc.*, 776 F.3d at 1304 (citing and quoting *Slater v. Energy Servs. Grp. Int'l, Inc.*, 634 F.3d 1326, 1330 (11th Cir. 2011), abrogated on other grounds by *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, — U.S. ——, 134 S.Ct. 568, 187 L.Ed.2d 487 (2013)).

principles dictate that "a specific provision dealing with a particular subject will control over a different provision dealing only generally with that same subject." [40] A confirmation order is not construed in a vacuum, but it is interpreted with the plan of reorganization. [41] Creditors' pre-confirmation claims are subsumed in and replaced by the new contract created by the confirmed plan of reorganization. [42] Thus, "each claimant gets a new claim, based on whatever treatment" is detailed in the plan. [43]

■ Under basic Chapter 11 bankruptcy law, upon confirmation, a creditor exchanges its prepetition claim for a new claim defined by its treatment under a plan of reorganization. The old claim is discharged and uncollectible. A new claim arises for whatever is required by the confirmed plan of reorganization. If the post-confirmation debtor fails to honor its obligations under the confirmed plan, the creditor can seek relief. But, the old, prepetition claim is not resurrected for collection. The Plan here precisely outlined how the Creditors' claims would be paid—Class 4 prepetition unsecured creditors would receive quarterly payments for four years under the Cash Flow Note in full satisfaction of their claims. This was the deal struck by the Parties and approved during the confirmation process. Though these individual Creditors did not vote in favor of or object to the Plan, they are bound by their treatment as Class 4 creditors because sufficient numbers of similarly situated Class 4 creditors overwhelmingly voted to accept this treatment. Although the Court is sensitive to the events that gave rise to the Creditors' particular claims, they are still unsecured claims subject to the same treatment as any other unsecured claim of the Debtor.

Creditors' reliance on Paragraph 15 of the Confirmation Order to justify their continued collection activity is misplaced. The language at the end of the paragraph allowing claims for "gross negligence or willful misconduct" to survive is inconsistent with the Plan, contrary to the intent of all parties during the confirmation process, and appears a clear scrivener's error.

Paragraph 15 is a general provision that references specific provisions in the Plan and Confirmation Order. The prefatory words in Paragraph 15 limit their scope "except as otherwise provided in the Amended Plan and this Confirmation Order." Creditors' claims were treated *specifically* in the Plan as unsecured Class 4 claims. Treatment through the Plan meant their claims are fully satisfied regardless of what gave rise to the claims, whether they were for breach of contract or sexual harassment. Creditors' claims were subsumed in and replaced by the treatment afforded to them under the Plan. This specific treatment controls over the general language used in Paragraph 15 of the

**40.** *CWI, Inc. v. LDRV Holdings Corp.*, No. 8:13-cv-93-T-35MAP, 2014 WL 12573016 at *5 (M.D. Fla. Mar. 26, 2014) (quoting *Idearc Media Corp. v. M.R. Friedman & G.A. Friedman, P.A.*, 985 So.2d 1159, 1161 (Fla. 3d DCA 2008)) (internal quotations omitted).

**41.** *In re 8 Mile Ranch, LLC*, No. 6:12-BK-10227-KSJ, 2015 WL 5307389, at *6 (Bankr. M.D. Fla. Sept. 10, 2015).

**42.** *In re Gonzalez*, No. 06-12099-BKC-AJC, 2010 WL 3123127 at *1 (Bankr. S.D. Fla.

Aug. 4, 2010) (citing *In re New River Shipyard, Inc.*, 355 B.R. 894, 912 (Bankr. S.D. Fla. 2006)); *See also In re Angel Fire Corp.*, No. 11-93-12176-SS, 2012 WL 5880675 at *7 (Bankr. D.N.M. Nov. 20, 2012) (collecting cases).

**43.** *In re Gonzalez*, 2010 WL 3123127 at *1 (quoting *In re New River Shipyard*, 355 B.R. at 912 (quoting *Holstein v. Brill*, 987 F.2d 1268, 1270 (7th Cir. 1993))) (internal quotation marks omitted).

Confirmation Order that for some unexplained reason appears to allow claims for "gross negligence or willful misconduct" to survive. This expansive language is without meaning or justification.

Aside from the strange last phrase of Paragraph 15, the Plan and Confirmation Order are premised on the idea that creditors would not be able to collect on unsecured pre-confirmation claims against the Debtor. The Court will not give these thirteen words in a general paragraph (perhaps placed poorly) more weight than a specific paragraph and the clear intent in the Plan. The contract created by the Plan and Confirmation Order controls, and the Creditors' claims are fully satisfied.

No party, including any of these Creditors, believed at the confirmation hearing that their prepetition claim would survive after confirmation. Rather, including this language appears a glaring error, which, in hindsight, should have been fixed at the time. Although the drafting attorneys should have been more careful in their use of language and the Court also should have caught their error, I cannot now enforce this provision that is contrary to the Plan, the parties' understanding, and the entire confirmation process. Debtor bargained for a "fresh start" discharging it of old, prepetition debt. Debtor is entitled to the benefit of its Plan

Creditors cannot express surprise insofar as they received everything they were entitled to receive under the Plan. Similar to every other unsecured creditor in Class 4, they received payments under the Cash Flow Note. They knew their claim was fully satisfied at the end of the four year payment period. Yet, they waited years before contending, relying on Paragraph 15 of the Confirmation Order, they can continue to collect on their prepetition claims to the extent they arose from "gross negligence or willful misconduct." They understandably are trying to capitalize on this mistake; however, the Court, belatedly, will strike the offensive provision from Paragraph 15 of the Confirmation Order.

Accordingly, it is

**ORDERED:**

1. The Creditors' Motion for Clarification (Doc. No. 232) is **GRANTED.**

2. The exception outlined in Paragraph 15 of the Confirmation Order does not allow the Creditors to collect their prepetition claims.

3. The words "expect for any claims or actions related to gross negligence or willful misconduct" are stricken from Paragraph 15 of the Confirmation Order.

4. The Clerk is directed to re-close the case.

